**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge Christine M. Arguello**

Civil Action No.:  1:18-cv-00231-CMA-MJW

EXECUTIVE CONSULTING GROUP, LLC, *d/b/a* ECG Management Consultants,

      Plaintiff,

v.

DEIRDRE BAGGOT,

      Defendant.

---

**ORDER GRANTING PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION**

---

      This matter comes before the Court upon Plaintiff Executive Consulting Group,

LLC's, d/b/a ECG Management Consultants ("ECG"), Motion for Preliminary Injunction

("Motion"), in which Plaintiff seeks a preliminary injunction against Defendant Deirdre

Baggot ("Defendant").  (Doc. # 3.)  The Court has reviewed the Motion together with

ECG's memorandum in support thereof (Doc. # 4); Defendant's opposition (Doc. # 30);

and ECG's reply (Doc. # 36).  The Court also held a full-day hearing on March 1, 2018,

at which the Court received testimony and other evidence.[1]  For the reasons set forth

below, the Court grants ECG's Motion.

---

[1] Citations to "Ex." refer to exhibits admitted at the hearing, and citations to "Tr." refer to the official transcript of the hearing.

# I.    <u>BACKGROUND</u>[2]

The Court summarized the procedural history of the instant dispute in a recent

order as follows:

> Plaintiff Executive Consulting Group, LLC, d/b/a ECG Management Consultants ("ECG"), is a strategic consulting firm serving the healthcare industry. (Doc. # 1 at 2.) Defendant began working as a Principal for ECG on January 11, 2016. (*Id.* at 3.) Two weeks prior, Defendant signed an offer letter from ECG that provided she would lead ECG's bundled payment practice and outlined her compensation. (*Id.* at 3-4.) The offer letter also stated that Defendant, as an ECG employee, was "bound to hold [corporate] information in strictest confidence and not to disclose confidential information or allow it to be disclosed, during or after [her] employment." (*Id.* at 4.) Defendant executed an Employment Agreement with ECG at the same time. *See* (Doc. # 1-1.) Relevant here, the Employment Agreement included a Non-Competition Provision, a Non-Solicitation Provision, and a Confidentiality Provision. (*Id.* at 4-9.) In the event Defendant violated these or other provisions, the Employment Agreement allowed ECG to "apply for a temporary restraining order, preliminary injunction, specific performance, or other interim or equitable relief." (*Id.* at 11.)
>
> On January 19, 2018, some two years into her employment with ECG, Defendant informed her supervisor in a phone call and a letter that she was resigning from ECG effective 30 days thereafter. (Doc. # 1 at 9.) On January 23, 2018, Defendant informed her supervisor that she was accepting a new position with ECG's direct competitor, The Chartis Group ("Chartis"). (*Id.*)
>
> On January 29, 2018, ECG filed a complaint for injunctive relief against Baggot. *See generally* (*id.*) The Complaint alleges that Baggot sent numerous emails containing ECG's confidential, proprietary, and trade secret information, from her ECG account to her personal email address three days before she submitted notification of her resignation. (*Id.*) It also alleges that Baggot was scheduled to speak at a conference on ECG's behalf and using its material the following day, January 30, 2018. (*Id.*) ECG raises five claims for relief: (1) breach of contract; (2)

---

[2] As required by Federal Rule of Civil Procedure 52(a)(2), the Court provides "the findings and conclusions that support" the instant Order. *See Prairie Band of Potawatomi Indians v. Pierce*, 253 F.3d 1234, 1245 (10th Cir. 2001) ("Under Rule 52(a), a district court is required to make findings of fact and conclusions of law at the time it enters a preliminary injunction.").

> misappropriation of trade secrets under federal law; (3) misappropriation of trade secrets under Colorado state law; (4) misappropriation of trade secrets under Delaware state law; and (5) unjust enrichment. (*Id*. at 14–17.) ECG simultaneously filed an Emergency Motion for a Temporary Restraining Order ("TRO") (Doc. # 2) and a Motion for a Preliminary Injunction (Doc. # 3).
>
> The following day, January 30, 2018, the Court issued ECG's requested TRO after a brief hearing on ECG's emergency motion. *See* (Doc. ## 12, 13.)

(Doc. # 63 at 1–3.)

At the March 1, 2018, hearing on the instant Motion, the Court received testimony from Defendant and from Stephen Messinger, the President of ECG. *See* (Doc. # 64.) Based on this testimony, the Court finds as follows. Before Defendant began her employment with ECG, she spoke with an attorney regarding her Employment Agreement with ECG; came up with 15 proposed revisions to the agreement; and specifically read the Non-Competition and Non-Solicitation Provisions. (Tr. at 35:23–36:24.) Defendant successfully negotiated with Mr. Messinger to reduce the duration of her Non-Competition Provision from 24 months to the 12 months reflected in the agreement. (Tr. at 32:23–33:9.) Mr. Messinger testified that ECG intends for the Non-Competition Provision in the Employment Agreement to protect ECG's trade secrets. (Tr. at 234:4–7.)

According to Mr. Messinger, ECG, which has approximately 287 employees, hired Defendant "with a singular purpose of building a world class consulting operation for bundled payment services." (Tr. at 170:19–21, 182:8–21.) ECG made Defendant the leader of the bundled payments practice and hired her as 1 of only 33 Principals at ECG, which is ECG's highest client-facing title. (Tr. at 181:22–182:7.) The titles below

Principal are, in descending order of rank, Associate Principal, Senior Manager, Manager, Senior Consultant, Consultant, Senior Analyst, and Analyst. (*Id.*) Defendant earned more than $900,000 per year in compensation and was no less than the fifth highest-paid employee of the entire firm during both 2016 and 2017. (*Id.* at 39:7–12, 183:3–18.) She also was one of only 26 employees at ECG who held equity in ECG's holding company. (*Id.* at 43:9–24, 183:19–185:3.)

While at ECG, Defendant recruited, trained, and supervised approximately five other employees in the bundled payments practice. (Ex. 10 at 23–27; Tr. at 50:17–25, 53:12–54:4.) Defendant had a role in hiring and firing employees within the practice. (Tr. at 54:19-24.) As a Principal, Defendant was part of ECG's management team and contributed to ECG's strategies at a firm-wide level, including proposing a new parental leave policy that the firm adopted. (Tr. at 184:4–185:1.) Defendant executed contracts and engaged counsel on behalf of ECG. (Tr. at 185:2–18.). Defendant also directed marketing efforts and independently approved a variety of client billable and non-billable expenditures within her practice, including, for example, a multiday meeting for her bundled payments practice area in Philadelphia that resulted in approximately $25,000 in direct and indirect costs. (Tr. at 188:6–190:22.) While she was employed at ECG, Defendant performed work from a password-protected laptop, and had access to ECG's secured, password-protected systems, including ECG's customer relationship management software and Microsoft SharePoint. (Tr. at 57:17–58:15.)

Like ECG, Chartis is a healthcare consulting firm, and both firms compete in the area of bundled payments. (Tr. at 58:21–59:5.) As Defendant explained, bundled

payments are an "alternative to 'fee for service,' which is the traditional way healthcare has been reimbursed . . . it is a fixed price that [the Centers for Medicare and Medicaid Services ("CMS")] has been studying in an effort to address issues of overtesting, overtreating, [and] variation."  (Tr. at 29:20–30:6.)

Defendant was in contact with Chartis regarding potential employment by the fall of 2017.  She interviewed with Chartis representatives on September 27, 2017, and was asked to present materials concerning her "current work" at ECG.  (Tr. at 59:9–60:20; Ex. 68.)  In an email to her recruiter, Defendant explained that she "didn't print anything for fear of getting sued or fired," but instead displayed ECG materials from her laptop during the interview.  (Tr. at 60:23–63:15; Ex. 15.)  On November 30, 2017, Defendant accepted a position as a Director and Business Leader of Chartis's bundled payment offering and agreed to a start date of January 22, 2018.  (Tr. at 63:19–64:4.)

On December 4, 2017—while she was still employed with ECG—Defendant sent an email to Chartis Director Cindy Lee regarding BPCI Advanced, a new bundled payments initiative of the CMS.  (Ex. 50.)  Defendant explained that "I expect a big announcement from CMS very soon" and noted that "[t]he more clients we can do [letters of intent] for[,] I find we will lock them in for [the] entire 5 years of [the] program." (*Id.*)  Defendant added that "[i]f [an] announcement comes before end of year we will need to strategize quickly as once clients sign on with a consultant it's hard to get them to switch," and she asked for "help profiling [Chartis] potential client targets before end of year."  (*Id.*)  At the hearing, Defendant acknowledged that "consultants would be competing to try to get providers signed up for" "consulting services regarding" BPCI

Advanced.  (Tr. at 67:16–68:16.)  On the last day of 2017, Defendant collected a scheduled $295,000 bonus from ECG.  (Tr. at 69:12–20.)

From January 16 to January 19, 2018, Defendant sent from her ECG email address to her personal email address more than 30 emails.  (Tr. at 77:17–79:19; Ex. 14.)  By way of example, these emails include: (1) a list of current clients and client contact persons for ECG's bundled payments practice (Ex. 14-5); (2) a list of all active projects, including client name, project description, project manager, and project start date, for all of ECG, not only the bundled payments practice (Ex. 14-7); materials (marked "confidential" throughout) for presentations to active ECG clients as part of ongoing work for those clients, including ECG's analyses and recommendations for those clients (Ex. 14-9; Ex. 14-34); pitch decks for prospective ECG clients (Ex. 14-10, Ex.14-19); a contract between ECG and a vendor marked "confidential" throughout (Ex. 14-11); emails regarding specific engagements ECG was pursuing (Ex. 14-16; Ex. 14-28); and a packet of materials from an ECG's Principals' Meeting, setting forth firm performance metrics, recruitment strategies, and a list of ECG's "key accounts" and strategies for those accounts (Ex. 14-29).

On January 19, 2018, approximately two years into her tenure at ECG, Defendant gave Mr. Messinger notice of her resignation.  (Tr. at 74:1–7; Ex. 18.)  In her resignation letter, Defendant stated that she "will work to ensure a smooth transition over the next 30 days and would request that my last day of employment be February 16th, 2018."  (Ex. 18.)  However, as noted, Defendant was set to begin working at Chartis on January 23, 2018, and indeed, she did begin working at Chartis on

approximately that date.  (Ex. 64 at 34–35.)  ECG did not discover that Defendant was working for Chartis until Defendant sent an email to Mr. Messinger on January 23, 2018, from a Chartis email account noting her "intent to seek employment with The Chartis Group."  (Tr. at 173:7–17; Doc. # 1 ¶ 32.)  Following ECG's discovery that Defendant had become employed with Chartis, the parties agree that Defendant's last day of employment with ECG was effectively January 19, 2018.  (Tr. at 93:18–94:17.)  Once Defendant received her Chartis computer, it appears that she inserted a jump drive into that computer and accessed files concerning two of ECG's clients.  See  (Tr. at 18:22–19:7; Ex. 17; Ex. 64 at 96:11–101:18.)  Defendant currently is "on leave" from Chartis to "deal with this" lawsuit.  (Tr. 161:14–17.)

Mr. Messinger explained that Chartis is ECG's "number one competitor" and that ECG competes with Chartis for approximately five projects per month, amounting to tens of millions of dollars of work.  (Tr. at 181:12–21.)  He explained that ECG "would have no way of knowing of the . . . lost opportunities from clients not calling us or calling Chartis because of [Defendant] going there."  (*Id.*)  Mr. Messinger also testified that assisting a client with a letter of intent—as Defendant explained to Chartis's Ms. Lee—would likely lead a consulting firm to "retain that client for years and years and years, because of all [the] follow on and ancillary work associated with that."  (Tr. at 179:25–180:8.)

Regarding the documents Defendant emailed to herself, Mr. Messinger noted that a client list, for example, "gives insight to key contacts within [the client's] organization" and would provide a competitor "effectively, with the treasure map, with

the huge opportunity to go and understand the business that we're doing."  (Tr. at 234:19–235:3.)  Mr. Messinger also described the "constant" efforts that go into developing the information reflected in the list, including investment in thought leadership, developing consultant expertise, supporting publication efforts, and sponsoring speaking engagements.  (Tr. at 235:4–12.)  Mr. Messinger noted that ECG "entrust[s] [its] consultants, like [Defendant], with confidential proprietary client information and our trade secrets" and "take[s] seriously the duty of protecting . . . not only client information, but strategic information and other trade secrets."  (Tr. at 234:4–15.)

## II.   ANALYSIS

### A.   LEGAL STANDARD

To obtain a preliminary injunction under Federal Rule of Civil Procedure 65, the movant must show that: (1) it has a substantial likelihood of success on the merits; (2) it will suffer irreparable injury unless the injunction issues; (3) the threatened injury outweighs whatever damage the injunction may cause the opposing party; and (4) the injunction would not be adverse to the public interest.  *See Schrier v. Univ. Of Colo.,* 427 F.3d 1253, 1258 (10th Cir. 2005).  A movant's right to preliminary injunctive relief must be "clear and unequivocal."  *Greater Yellowstone Coal. v. Flowers*, 321 F.3d 1250, 1256 (10th Cir. 2003).[3]

---

[3] Where a movant seeks a so-called "disfavored" preliminary injunction, the movant must meet a "heightened burden."  *See O Centro Espirita Beneficiente Uniao Do Vegetal v. Ashcroft*, 389 F.3d 973, 975 (10th Cir. 2004).  Categories of disfavored preliminary injunctions include "(1) preliminary injunctions that alter the status quo; (2) mandatory preliminary injunctions; and (3) preliminary injunctions that afford the movant all the relief that it could recover at the conclusion

**B.     APPLICATION**

**1.     <u>ECG Is Substantially Likely to Succeed on the Merits</u>**

*a.     Breach of Contract Claim.*

The parties' primary dispute with respect to ECG's breach of contract claim is whether the Non-Competition Provision of the Employment Agreement is enforceable. The Employment Agreement contains a Delaware choice of law provision.  *See* (Ex. 2 § 9.10.)  Defendant argues that the choice of law provision is unenforceable, that Colorado law applies instead, and that the Non-Competition Provision is unenforceable under Colorado law.  ECG maintains that Delaware law applies to the Employment Agreement, but that it is enforceable under Colorado law in any event.  The Court concludes that the Employment Agreement is enforceable under both Delaware and Colorado law and therefore does not reach the choice of law question.  *See* (Doc. # 64.)

Under Delaware law, restrictive covenants, including confidentiality, non-competition, and non-solicitation provisions, are generally enforceable, and courts routinely provide injunctive relief to enforce them.  *See, e.g.*, *Coface Collections N. Am. Inc. v. Newton*, 430 F. App'x 162, 166 & n.3 (3d Cir. 2011) (affirming grant of preliminary injunction to enforce non-compete under Delaware law); *Revolution Retail Sys., LLC v. Sentinel Techs., Inc.*, No. CV 10605-VCP, 2015 WL 6611601, at *25 (Del. Ch. Oct. 30, 2015) (granting permanent injunction as to violation of confidentiality and non-compete clauses); *Gas Oil Prod., Inc. of Delaware v. Kabino,* No. C.A. 9150, 1987 WL 18432, at *1 (Del. Ch. Oct. 13, 1987) (granting preliminary injunction to enforce covenants not to

of a full trial on the merits."  (*Id.*)  None of these categories is relevant here, and Defendant has not argued otherwise.

compete). However, covenants not to compete must be reasonable geographically and temporally to be enforceable. *See American Homepatient, Inc. v. Collier*, 2006 WL 1134170, at *4 (Del. Ch. Apr. 19, 2006).

Here, Defendant's Non-Competition Provision precludes her, for twelve (12) months from her Termination Date (the date her employment with ECG ended, January 19, 2018) from providing "Management Consulting Services"[4] to persons or entities located in states[5] where ECG has provided such services within the 36 months leading up to the Termination Date. Courts applying Delaware law regularly enforce covenants not to compete with similar or greater durations and geographic restrictions. *See Research & Trading Corp. v. Powell*, 468 A.2d 1301 (Del. Ch. 1983) (enforcing two-year

---

[4] "Management Consulting Services" is defined in the Employment Agreement as "the services offered to and/or performed for the Company's Clients and Prospective Clients during the thirty-six months before the Termination Date. This shall include but not be limited to all services described in the various client reports, proposals, and marketing materials prepared from time to time by the Company for purposes of soliciting client business and of which Employee had or would reasonably be expected to have (or have had) knowledge, or to which Employee had or would reasonably be expected to have (or have had) access, during Employee's employment with the Company." (Ex. 2 § 3.5(a).)

     The Court rejects Defendant's argument that "Management Consulting Services" is ambiguous and must be construed in her favor. *See* (Doc. # 83 at 7.) It also rejects Defendant's assertion that the term must therefore be interpreted to mean **only** bundled payment consulting provided by Defendant. *See* (*id.*) The Employment Agreement's definition of "Management Consulting Services" clearly refers to **all** management consulting services provided by anyone employed by ECG and of which Defendant had knowledge. For example, the definition includes as "Management Consulting Services" "services . . . prepared from time to time by the Company for purposes of soliciting client business **and** of which Employee had or would reasonably be expected to have (or have had) knowledge, or to which **Employee had or would reasonably be expected to have (or have had) access**, during Employee's employment with the Company." (Ex. 2 § 3.5(a)) (emphases added). Given Defendant's position as an executive, it is reasonable to expect that Defendant had access to ECG's services far beyond her own work on bundled payments. The Court therefore construes "Management Consulting Services" broadly.

[5] With respect to the geographic scope, the Court lists the applicable states at the end of this order, as established by a declaration from Mr. Messinger. *See* (Decl. of S. Messinger ¶ 3 (Doc. # 78-1).)

nationwide covenant not to sell lines of products competing with former employer's lines); *CIENA Corp. v. Jarrard*, 203 F.3d 312, 324 (4th Cir. 2000) (enforcing under Delaware law one-year, effectively nationwide non-competition and non-solicitation covenants against a regional sales director); *Faw, Casson & Co. v. Cranston*, 375 A.2d 463 (Del. Ch. 1977) (enforcing three-year covenant not to compete covering areas where employer had offices). Accordingly, the Court concludes that the Non-Competition Provision is enforceable under Delaware law.

The Non-Competition Provision also is enforceable under Colorado law because two exceptions to the Colorado statute that generally invalidates non-competes apply; specifically, Defendant was executive or management personnel at ECG, and the provision is for the protection of ECG's trade secrets. *See* Colo. Rev. Stat. §§ 8-2-113(2)(b), (d). In determining whether the executive or management personnel exception applies, courts consider several factors, including: where the employee fits in the company's compensation structure; the number of employees under the employee's supervision; whether the alleged manager had a role in setting company strategy; and the amount of autonomy the alleged manager possessed to make business decisions. *See DigitalGlobe, Inc. v. Paladino*, 269 F. Supp. 3d 1112, 1122 (D. Colo. 2017); *DISH Network Corp. v. Altomari*, 224 P.3d 362, 366 (Colo. App. 2009). Here, as described above, Defendant was one of the highest-paid employees at ECG; had several employees under her supervision; had a substantial role in setting company policy; and had significant autonomy to make business decisions, including autonomously executing contracts and incurring large expenses on behalf of the company. *See also*

(Doc. # 36 at 3–6.)  Accordingly, the Court is satisfied that Defendant falls within the executive or management personnel exception to Colorado's non-compete statute.

To meet the trade secrets exception, "the primary purpose of the covenant not to compete must be the protection of trade secrets and the covenant must be reasonably limited in scope." *Haggard v. Spine*, No. 09-CV-00721-CMA-KMT, 2009 WL 1655030, at *5 (D. Colo. June 12, 2009).  Here, a provision of the Agreement is dedicated to describing the types of proprietary information the Agreement protects, including know-how or methodologies, client lists, client proposals, client reports, and ECG internal memoranda and documents.  *See* (Ex. 2 § 4.3.)  The facts of this case illustrate the potential harm that can occur where an employee takes trade secret information to a competitor, confirming that the Non-Competition Provision protects trade secrets where it is observed.  Indeed, Defendant emailed to herself various documents that would have significant value to competitors such as Chartis, including client lists, a list of ECG's active projects, and multiple project proposals; she also accessed ECG client files from her Chartis computer.  Further, regarding scope, the Non-Competition Provision is reasonably limited in scope to protecting ECG's trade secrets; it is only twelve months in duration and is geographically limited, as discussed above.  The Court is therefore satisfied that the Non-Competition Provision meets the trade secrets exception to Colorado's non-compete statute.

Finally, the Court concludes that ECG is substantially likely to demonstrate that Defendant has breached and threatens to breach the various provisions of her Employment Agreement that are at issue.  With respect to the Non-Competition

Provision, Defendant already obtained employment with a competitor, Chartis, and currently is on leave. Defendant also does not dispute that her employment with Chartis is precluded by the language of the Non-Competition Provision. With regard to the Confidentiality Provision, Defendant emailed to herself information covered by the definition of confidential information (termed "Secrets") in the Agreement, including client lists, client contact information, ECG internal memoranda and documents, and client proposals. The Court also observes that Defendant retained ECG materials well after the Court entered the Temporary Restraining Order in this case. Defendant, for example, produced a jump drive containing ECG materials to ECG over a month after the Court entered the TRO, and it appears that additional materials may still be in her possession. *See* (Doc. ## 63, 68.) Finally, as concerns the Non-Solicitation Provision, Defendant emailed herself contact information for ECG's clients and offered to solicit clients for Chartis while she still was employed by ECG. In addition, following the end of her employment with ECG, Defendant accessed files concerning ECG clients from her Chartis computer. Accordingly, the Court concludes that there is a substantial likelihood that ECG will be able to demonstrate breaches of the pertinent provisions of Defendant's Employment Agreement.

### b.       *Claims for Misappropriation of Trade Secrets*

The Court also concludes that ECG is likely to succeed on its substantially similar claims for misappropriation of trade secrets pursuant to the federal Defend Trade Secrets Act and the Colorado and Delaware Uniform Trade Secrets Acts. Each of these statutes authorizes injunctive relief to restrain actual or threatened

misappropriation of a trade secret. *See* 18 U.S.C. § 1836(b)(3)(A); Colo. Rev. Stat. § 7-74-103; Del. Code Ann. tit. 6, § 2002.

As an initial matter, the documents Defendant emailed to herself include trade secrets as defined by the respective statutes. 18 U.S.C. § 1839(3) defines trade secrets as:

> [A]ll forms and types of financial, business, scientific, technical, economic, or engineering information, including patterns, plans, compilations, program devices, formulas, designs, prototypes, methods, techniques, processes, procedures, programs, or codes, whether tangible or intangible, and whether or how stored, compiled, or memorialized physically, electronically, graphically, photographically, or in writing if—
> (A) the owner thereof has taken reasonable measures to keep such information secret; and
> (B) the information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information.

Similarly, Colo. Rev. Stat. § 7-74-102(4) defines trade secrets as:

> [T]he whole or any portion or phase of any scientific or technical information, design, process, procedure, formula, improvement, confidential business or financial information, listing of names, addresses, or telephone numbers, or other information relating to any business or profession which is secret and of value.

Like the federal statute, the Colorado statute requires that the owner "must have taken measures to prevent the secret from becoming available to persons other than those selected by the owner to have access thereto for limited purposes."

*Id.* Likewise, Del. Code Ann. tit. 6, § 2001 defines trade secrets as follows:

> (4) "Trade secret" shall mean information, including a formula, pattern, compilation, program, device, method, technique or process, that: a. Derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or

14

use; and b. Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

The Court has reviewed the materials Defendant emailed to herself and is satisfied that they contain trade secrets, as they contain items that ECG has taken measures to keep secret and that have independent economic value. In regard to the secrecy component, Defendant testified that the ECG systems she accessed were password-protected. ECG also employs firewalls, antivirus software, intrusion protection and detection systems, encryption mechanisms, physical safeguards, and daily, weekly, and monthly server backups. (Doc. # 1 ¶ 10.) Accordingly, the Court is satisfied that ECG takes adequate measures to maintain the secrecy of the documents in question.

Turning to the second part of the analysis, many of the documents Defendant emailed to herself unquestionably have independent economic value, particularly in the hands of a competitor, including, for example, the lists of ECG clients and contact persons in the bundled payment practice (Ex. 14-5), the firm-wide listing of active ECG projects (Ex. 14-7), and the ECG presentations to active clients containing ECG's analyses and recommendations for those clients (Ex. 14-9; Ex. 14-34). *See, e.g.*, *Network Telecomms., Inc. v. Boor-Crepeau*, 790 P.2d 901, 901-03 (Colo. App. 1990) (trade secret protection exists for customer information, compiled by the employer, which provides the employer with "a significant business advantage"); *R & D Bus. Sys. v. Xerox Corp.*, 152 F.R.D. 195, 197 (D. Colo. 1993) (party's "parts and supplies sources, research and development efforts, market strategy, and customer lists" constituted trade secrets under Colorado law); *Xantrex Tech., Inc. v. Advanced Energy*

*Indus., Inc.*, No. 07-cv-02324-WYD-MEH, 2008 WL 2185882, *18 (D. Colo. 2008)

("Detailed customer information is a trade secret."); *Mattern & Assocs., L.L.C. v. Seidel*,

678 F. Supp. 2d 256, 266 (D. Del. 2010) (customer contact list, client proposals,

requests for proposal, client requirements, and various items associated with

employer's business methods qualified for trade secret protection under Delaware

Uniform Trade Secrets Act).

ECG also is substantially likely to establish that Defendant has misappropriated

and threatens to misappropriate its trade secrets. *See* 18 U.S.C. § 1839(5); Colo. Rev.

Stat. § 7-74-102(2); Del. Code Ann. tit. 6, § 2001. A person misappropriates trade

secrets under the federal statute when, *inter alia*, she acquires the trade secrets with

knowledge that they were acquired by improper means. *See* 18 U.S.C. § 1839(5); *see*

*also id.* § 1839(6) (defining "improper means" to include, *inter alia*, "breach of a duty to

maintain secrecy" and "theft"); *accord* Del. Code Ann. tit. 6, § 2001 (employing similar

definitions); Colo. Rev. Stat. § 7-74-102 (same); *see also, e.g., Saturn Sys. v. Militare*,

252 P.2d 516, 525 (Colo. App. 2011) (holding that under Colorado law all that is

required to establish misappropriation is evidence of "improper . . . acquisition of the

trade secret"); *Sonoco Prods. Co. v. Martinez*, 23 P.3d 1287, 1290 (Colo. App. 2001)

("Misappropriation" requires only the "improper disclosure or acquisition of the trade

secret"). Here, there is a high likelihood that ECG will establish both actual and

threatened misappropriation of its trade secrets by Defendant; as set forth above,

Defendant emailed the trade secrets to her personal email account, in violation of duties she owed to ECG under her Employment Agreement and otherwise.[6]

### 2. ECG Would Be Irreparably Harmed Absent the Injunction

A party can establish irreparable harm "by showing that a court would not be able to grant an effective monetary remedy for the injury caused by the non-movant's conduct." *Haggard*, 2009 WL 1655030, at *14 (*citing Dominion Video Satellite, Inc. v. EchoStar Satellite Corp.*, 269 F.2d 1149, 1156 (10th Cir. 2001)). "Injunctive relief is especially appropriate in non-competition cases because of the difficulty of proving money damages caused by illicit competition." *Id.*

The Court concludes that ECG will suffer irreparable harm if a preliminary injunction does not prevent Defendant from violating the Employment Agreement and misappropriating ECG's trade secrets. As outlined above, Defendant's violations of the agreement to date are legion. Moreover, Defendant's actions during this litigation have done nothing to reassure the Court that Defendant would comply with her obligations under the Employment Agreement. *See* (Doc. # 53.) The Court is persuaded by the testimony of Mr. Messinger about the difficulties of quantifying the full extent of the harm ECG would experience if Defendant were to work for a competitor like Chartis; it would indeed be very hard to determine if Chartis won a particular project or client due to Defendant's presence at Chartis and even harder to determine the damages that might accrue years later due to lost follow-on work. ECG also cannot determine the damage it might incur from Defendant's use of the internal ECG metrics and plans Defendant

---

[6] The Court does not address ECG's unjust enrichment claim, as it is not necessary to do so to determine the relief requested in ECG's Motion.

emailed to herself, *e.g.,* regarding recruitment, key clients, and financial performance. *See* (Ex. 14-29.) The Court agrees with ECG that the full extent of possible damage to ECG as a result of Defendant's conduct would very likely be impossible to ascertain, making injunctive relief appropriate.

### 3. The Threatened Injury to ECG Outweighs Any Harm to Defendant, and the Injunction Would Not Be Adverse to the Public Interest

The Court concludes that the harm ECG would experience if the Court does not grant the preliminary injunction outweighs any harm to Defendant. As just discussed, ECG's business stands to be significantly harmed if Defendant is not restrained from further violations. In contrast, Defendant would not be unduly harmed by an injunction. Defendant unilaterally terminated her employment with ECG and obtained new employment with Chartis. As far as the Court can discern, Defendant has no legal right to use the information she took from ECG. In addition, Defendant was well-compensated at ECG and is not the only source of income in her family. (Tr. at 163:8–14.) Further, her Employment Agreement does not broadly restrict her from working anywhere in the healthcare industry. Rather, the Employment Agreement prohibits Defendant from competing against ECG for a limited period of time. In addition, the Court notes that the Employment Agreement does not preclude Defendant from obtaining "direct employment with health systems, insurance companies, physician practices, federally qualified health centers, or managed care companies," employment for which Defendant appears qualified. (Ex. 2 § 3.5(a); Tr. at 197:4–17.) Finally, the Court does not see any way in which the requested injunction would adversely affect the public interest.

### III.   <u>CONCLUSION</u>

For the foregoing reasons, it is hereby ORDERED that ECG's Motion for Preliminary Injunction (Doc. # 3) is GRANTED.  It is

FURTHER ORDERED that Defendant is ordered to immediately return to ECG all confidential, proprietary, and/or trade secret information and property obtained from ECG, including all computer files, documents, notes, records, reports, and other papers (and all copies thereof) relating to ECG's business and all associated property that Defendant may possess or have under her control.  It is

FURTHER ORDERED that, subject to the preceding paragraph, Defendant shall preserve, in their original state, all documents and information in Defendant's possession, custody, or control, or otherwise available to Defendant, related to the issues set forth in ECG's Verified Complaint for Injunctive Relief, including, without limitation, hard copy or electronic files of documents, computer files, files or data stored in any cloud storage service (*e.g.,* Dropbox), files or data stored on any external storage device, hard drive data, ambient data, electronic mail messages, voice messages, instant messages, correspondence, and phone logs.  It is

FURTHER ORDERED that Defendant is prohibited from using, communicating, disclosing, or in any way sharing with any person or business ECG's confidential, proprietary, or trade secret information, including the following: inventions; technical information; training materials or courses; systems, techniques, methods, models, procedures, or processes; know-how or methodologies; manuals, contracts, reports; purchasing or accounting information; financial history or projections; legal affairs;

formulae; compositions; software or computer programs; research projects; business modes or information; the identity of all clients, client lists, and client contact information; monthly backlog reports and monthly pipeline reports; internal memoranda and documents; client reports, proposals, statements of qualifications; pricing data; financial data; sources of supply; marketing plans and/or strategies, including price strategies, marketing, sales, technology, research and development, production, or merchandising systems or plans; any information that may be protected under HIPAA privacy rules or similar federal, state or local laws; and information pertaining to any aspect of any activity or business of ECG or its clients, including information entrusted to ECG by third parties (including clients and prospective clients), or any trade secrets, or proprietary or confidential matter belonging to ECG or such third parties.  It is

FURTHER ORDERED that Defendant is prohibited, through January 19, 2019, or the expiration of this Order, whichever is earlier, from directly or indirectly, alone or as a partner, member, officer, director, shareholder, adviser, agent, consultant, employee, or otherwise, providing Management Consulting Services for any person or entity located in Alaska, California, Colorado, Connecticut, Florida, Georgia, Illinois, Kentucky, Louisiana, Maryland, Massachusetts, Mississippi, New Jersey, New York, Ohio, Oregon, Pennsylvania, Tennessee, Texas, Utah, or Washington.  It is

FURTHER ORDERED that Defendant is prohibited, through January 19, 2019 or the expiration of this Order, whichever is earlier, from directly or indirectly, alone or as a partner, member, officer, director, shareholder, adviser, agent, consultant, employee, or

otherwise (a) providing or proposing to provide to ECG's Clients[7] or Prospective

Clients[8] any Management Consulting Services similar to those that ECG provides, (b)

soliciting, calling on, inducing, or encouraging ECG's Clients to terminate or limit their

relationship with ECG or to send their business elsewhere, or (c) interfering with or

otherwise circumventing ECG's relationships with its Clients.  It is

FURTHER ORDERED that the Clerk of Court is directed to maintain this Order

under a Level 1 restriction in the CM/ECF filing system in view of the confidential and

proprietary information contained in Exhibits 1 and 2 hereto.  It is

FURTHER ORDERED that the Clerk of Court is directed to docket as a separate

docket entry in CM/ECF a publicly-available version of this Order that omits Exhibits 1

and 2 hereto.  It is

FURTHER ORDERED that this Order shall remain in effect through the trial of

this matter.


DATED:  April 25, 2018

BY THE COURT:

_____
CHRISTINE M. ARGUELLO
United States District Judge

---

[7] For purposes of this Order, "Clients" refers to the persons and entities listed on Exhibit 1
hereto, which are the relevant clients as established by Mr. Messinger's declaration.  *See* (Doc.
# 78-1.
[8] For purposes of this Order, "Prospective Clients" refers to the persons and entities listed on
Exhibit 2 hereto, which are the relevant prospective clients as established by Mr. Messinger's
declaration.  *See* (Doc. # 78-1.)